UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

KARRIE ACKLEY,
on behalf of herself and all
others similarly situated,

        Plaintiff,                              Case No. 22-cv-232

       v.

MARATHON CHEESE CORPORATION,

        Defendant.

---

## RENEWED JOINT MOTION FOR PRELIMINARY APPROVAL OF COLLECTIVE AND CLASS ACTION SETTLEMENT AND SUPPORTING SUPPLEMENTAL BRIEF

---

### INTRODUCTION

On June 6, 2023, Plaintiff Karrie Ackley, on behalf of herself and all others similarly situated, and Defendant Marathon Cheese Corporation (together, the "Parties"), jointly moved this Court for preliminary approval of the Parties' Settlement Agreement & Release ("Settlement Agreement"). (ECF No. 20.)

On January 5, 2024, this Court entered its Opinion and Order denying the Parties' motion without prejudice (this Court's "Order"). (ECF No. 23.) In response to that Order, the Parties now submit this *Renewed Motion for Preliminary Approval of Collective and Class Action Settlement and Supporting Brief* to address the Court's four questions related to certification and its "several concerns about the terms of the settlement." (ECF No. 23, at 3, 5.)

### CERTIFICATION

#### I.    QUESTION 1

The Court's first question concerning certification sought clarification regarding the

identity of the employees included in Exhibit A to the Parties' Settlement Agreement. (*Id.* at 3.) Exhibit A includes *all hourly-paid production employees* employed by Defendant between April 26, 2019, and April 26, 2022 (the putative collective), which necessarily includes all hourly production employees employed by Defendant in Wisconsin between April 26, 2020, and April 26, 2022 (the putative class). (Decl. of Erin M. Cook ("Cook Decl."), ¶ 2.) Production employees include line workers, machine operators, maintenance and warehouse, and similar positions. (*Id.*) To alleviate any confusion and because each individual is assigned specified damages should they opt-in and/or not opt-out, the Parties agreed to identify the putative class and collective members by name in Exhibit A. (*Id.* ¶ 3.)

## II.    QUESTION 2

The Court's second question asks why the periods of time applicable to the collective and class end on April 26, 2022, the date upon which Plaintiff filed her Complaint. (ECF No. 23, at 3.) Coincidentally, Defendant changed its rounding policies effective April 25, 2022, the day before Plaintiff filed her Complaint. To standardize its timekeeping practices across all locations, Defendant implemented a formal policy that rounds production employees' punch in and punch out times to the nearest quarter hour. The practice of rounding punch-in and punch-out times to the nearest quarter hour complies with the FLSA, specifically the DOL rounding regulations. 29 C.F.R. § 785.48(b); *Adair v. Wisconsin Bell, Inc.*, No. 08-C-280, 2008 WL 4224360, at *11-12 (E.D. Wis. Sept. 11, 2008) (affirming that "the practice of rounding…to the nearest tenth or quarter hour, is expressly approved by the FLSA regulations…" and denying conditional certification based on policy of rounding to nearest quarter hour); *see also Corbin v. Time Warner Ent.*, 821 F.3d 1069, 1078-79 (9th Cir. 2016) (joining "the consensus of district courts" by upholding policy of rounding to nearest quarter hour, which was "neutral on its face and as applied" to plaintiff-

employee over several pay periods). Thus, the Defendant's current rounding practice does not create continuing liability, and putative class and collective members are not forfeiting damages that accrued between April 26, 2022, and the date the case is resolved.

The Parties agreed in settlement negotiations to close the class and collective periods on Plaintiff's donning and doffing claims on April 26, 2022, too, but for a different reason. (Cook Decl., ¶ 18; Supplemental Declaration of James A. Walcheske ("Walcheske Supp. Decl."), ¶ 36.) Although Plaintiff assigned damages to her donning and doffing claim in settlement negotiations, Defendant held steadfast to its position that Plaintiff's donning and doffing claim would never obtain class and/or collective certification because Defendant did not have a common donning and doffing policy that violated the FLSA or WWPCL, and without a common policy or practice in place, the number of individualized inquiries necessary to resolve issues of liability made representation on a class and collective basis untenable. (Cook Decl., ¶ 17.) Defendant further argued that any time spent donning and doffing was *de minimis.* (*Id.*) Plaintiff ultimately assigned damages to the donning and doffing claim, which is how Defendant ended up agreeing to a Gross Settlement Amount above its damage model. To reach a final negotiated settlement, Plaintiff agreed to release the donning and doffing claims through the date of final approval. (Walcheske Decl. ¶ 36.)

As a final point, when putative class and collective members are notified of the settlement, they will also be notified that the release runs through the date of final approval. Putative class and collective members will also be notified of their ability to object to the settlement if they disagree with any aspect, including the discrepancy between the end of the class and collective periods and the effective release date. For all these reasons, the Parties believe the "mismatch is justified."

### III.    QUESTION 3

The Court's third question inquires as to whether Plaintiff is an adequate representative for employees in the States of Mississippi and Idaho, when she was employed by Defendant in Wisconsin. (ECF No. 23, at 3-4.)  The Parties discussed this point in settlement negotiations and ultimately agreed that Plaintiff is an adequate representative of employees in Mississippi and Idaho because, despite the variations in practices between Defendant's locations, the nature of the alleged harm is the same: Defendant's alleged failure to fully compensate its production employees by unlawfully rounding hours worked and failing to compensate for time spent donning and doffing. (Walcheske Suppl. Decl. ¶ 37.)

More specifically, the rounding claims are based on Defendant's general practice, across all locations, of paying hourly production employees from shift start to shift end from at least April 26, 2019, until April 25, 2022. (*See id*.) Plaintiff's donning and doffing claims are based on Defendant's requirement that all production employees at all locations don and doff at least some form of protective gear. (*Id*.) As such, Plaintiff's claims and the claims of Idaho and Mississippi production employees involve the same legal theories—unlawful rounding and failure to compensate for time spent donning and doffing—and arise from Defendant's general timekeeping and donning/doffing policies. The variations between locations simply impact the extent of the alleged harm and is accounted for in the Parties' damages modeling. Accordingly, Plaintiff is an adequate representative plaintiff for employees in Wisconsin, Mississippi, and Idaho.

### IV.    QUESTION 4

The Court's fourth and final question regarding certification concerned Plaintiff's counsel's adequacy under Fed. R. Civ. P. 23(g)(1). (ECF No. 23, at 4.) Specifically, this Court

asked that counsel address "the other Rule 23(g) factors, including their experience working on these types of cases…." (*Id.*)

Pursuant to Fed. R. Civ. P. 23(g)(1), when determining Plaintiff's counsel's adequacy, the Court must consider:

> (i)   the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii)   counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii)   counsel's knowledge of the applicable law; and
>
> (iv)   the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A).

Here, Plaintiff's counsel initially engaged in a pre-suit investigation of Plaintiff's potential claims against Defendant by meeting and speaking with Plaintiff and reviewing information provided to counsel by Plaintiff, including copies of Plaintiff's Earnings Statements and images of Defendant's "Clock Cards" policy and "Attendance Policy." (Walcheske Supp. Decl. ¶ 20.) Independent of Plaintiff, counsel also investigated Defendant, generally, including reviewing publicly available information concerning its operations and locations. (*Id.* ¶ 22.) Based on its investigation, counsel determined that there was a reasonable basis to believe that Plaintiff and other hourly-paid employees were similarly situated, in that they were uniformly subject to Defendant's policies and practices concerning timekeeping and compensation, specifically, timeshaving (via electronic timeclock rounding) and failure to compensate employees for time spent donning and doffing and engaging in required food safety procedures. (*Id.* ¶ 23.) The information learned later translated into Plaintiff's Complaint (ECF No. 1), and the allegations and causes of action asserted therein. (Walcheske Supp. Decl. ¶ 24.)

During the litigation, Plaintiff's counsel further investigated the underlying merits of Plaintiff's causes of action, as well as the potential damages flowing therefrom, based on documents and information concerning Defendant's policies, locations, and the employees at those locations, as well as tens of thousands of rows of timekeeping data pertaining to Plaintiff and other hourly-paid employees of Defendant. (*Id.* ¶ 25.) Based on all of the information gathered prior to filing and during the life of this litigation, Plaintiff's counsel continues to believe in the merits of Plaintiff's causes of action as asserted in her Complaint, and also is of the opinion that the causes of action asserted and prosecuted in this litigation appropriately encapsulate the alleged violations of the FLSA and WWPCL, such that the Parties' Settlement Agreement resolves all disputes arising thereunder. (*Id.* ¶ 35.)

Plaintiff's counsel is confident in its analysis and its ability to continue to represent the best interests of Plaintiff and the presently absent class members, given its vast experience in wage and hour litigation pursuant to the FLSA and WWPCL, as well as the favorability of the outcomes counsel has achieved for its clients and classes it has represented.

Attorney James A. Walcheske is lead counsel for Plaintiff (and the proposed class) in this matter. (*Id.* ¶ 2.) Attorney Walcheske has devoted most of his professional time and efforts representing employees in employment matters, particularly wage and hour matters, since his admission to the Bar of the State of Wisconsin in 2008. (*Id.* ¶¶ 3, 9.) Attorney Walcheske is a member of the National Employment Lawyers Association ("NELA"), Wisconsin Employment Lawyers Association ("WELA"), and the Labor and Employment Law Section of the Wisconsin State Bar Association. (*Id.* ¶ 5.) Indeed, Attorney Walcheske and his firm recently filed an *Amici Curiae* Brief in the United States Court of Appeals for the Seventh Circuit in support of the Plaintiff-Appellee and on behalf of NELA and WELA in a complex wage and hour matter arising

out of litigation before this Court (*Vanegas v. Signet Builders, Inc.*, Case No. 21-cv-00054-jdp). (*Id.* ¶ 11.)

Attorney Walcheske is a frequent speaker on wage and hour laws and issues, (*id.* ¶ 6), was named as a "Rising Star" in employment litigation from 2012 to 2021, and a "Super Lawyer" in the same field in 2022 and 2023 by Thomson Reuters, and was named in the "Best Lawyers in America" from 2018 to 2023 by U.S. News & World Report. (*Id.* ¶¶ 7-8.) Similarly, his firm, Walcheske & Luzi, LLC, has been named in the "Best Law Firms in America" in the areas of "Employment Law – Individuals," and "Litigation – Labor and Employment," from 2018 to 2023 by U.S. News & World Report. (*Id.* ¶ 8.)

Over his career, and while not necessarily lead counsel in each and every case, Attorney Walcheske has been counsel in approximately 538 federal court cases involving employment matters, 383 of which involved wage claims, and 258 of which were class actions. (*Id.* ¶ 12, Exs. 1-2.) Attorney Walcheske's experience with wage claims ranges from single plaintiff litigation to collective and class actions covering thousands of employees, such as that presented here. (*See id.* ¶ 10.) Notably, of the 383 federal court wage claims in which Attorney Walcheske was counsel, 145 involved settlements that were presented for court approval. (*Id.* ¶ 15.) No objections were received in response to any of those settlements, all of which ultimately received final approval. (*Id.*)

Finally, and as to the resources committed to the class, Attorney Walcheske and his firm have made themselves available to all class members through the Parties' proposed Notice and are capable of handling any inquiries and issues that may arise. (*Id.* ¶¶ 17-18.) Indeed, while the Parties intend to utilize the services of a Settlement Administrator to administer their settlement, Walcheske & Luzi itself has administered numerous class action settlements internally (in addition

to notice administration subsequent to conditional certification). (*Id.* ¶ 17.) Accordingly, Plaintiff's counsel is well-positioned to represent the class's interests in this process.

## THE TERMS OF THE PARTIES' SETTLEMENT AGREEMENT

This Court also raised "several concerns about the terms of the settlement" in its Order. (ECF No. 23, at 5.) Each of those concerns is addressed in order below.

## I.    ADEQUACY OF RELIEF

In its Order, the Court expressed concerns regarding a lack of information from which this Court could assess whether the relief to the class and collective through the Parties' settlement is adequate. (*Id.*) Specifically, the Court raised questions concerning each step taken by the Parties to determine the relief provided to the class and collective (as set forth in Attorney Walcheske's Declaration, ECF No. 21). (*Id.,* at 5-6.) The Court then inquired as to the relationship between these steps and the Parties' damages estimates, (*id.*, at 6), and what "an appropriate discount is" in this case, relative to the risks present in this litigation. (*Id.*, at 7.)

The Gross Settlement Amount of $950,000 represents a negotiated settlement and is higher than Defendant's damage model but lower than Plaintiff's damage model. Given the difference between the Parties' damage models, it is appropriate for the Parties to review their individual damages modeling that was relied upon to reach the negotiated settlement, which the Parties both agree is fair, reasonable, and just to resolve this litigation on a class and collective basis.

### A.    Plaintiff's Counsel's Damages Modeling

As indicated, the steps set forth in Attorney Walcheske's Declaration described Plaintiff's counsel's data analysis. Indeed, steps one (1) through four (4) were internal to Plaintiff's counsel. (*See* ECF No. 21, ¶ 18.) The fifth step describes the *pro rata* allocation of the Net Settlement Fund to each member of the putative class and collective. (*See id.*; *see also* ECF No. 20-1.) Thus, the

first four (4) steps relate to Plaintiff's counsel's underlying analysis and calculations, not to the ultimate allocations to class and collective members. (*See* ECF No. 21, ¶ 18.)

As indicated, *supra*, Plaintiff provided her counsel with records she had at her disposal to assist in validating her claims prior to filing the same. Plaintiff's counsel's first step in furthering that investigation and validation was its review of records specific to Plaintiff. (*See id.*) Because Plaintiff is the only plaintiff in this litigation, counsel's review of Plaintiff's records with her allowed Plaintiff's counsel to get a better understanding of the effect of Defendant's timekeeping system (with respect to not only the amount of time "shaved," but also the net effect of that timeshaving in addition to not including her time spent donning and doffing) on her hours worked and, ultimately, her compensation. (*See id.*; *see also* Walcheske Suppl. Decl., ¶¶ 19, 21.) Thus, the first step as described was geared more toward working with Plaintiff to further investigate and validate her claims, than using her data as provided by Defendant to determine the potential damages of or allocations to putative members of the class and collective.

Plaintiff's counsel's second step was to analyze a data sample from Defendant for 220 employees. (ECF No. 21, ¶ 18; *see also* Walcheske Supp. Decl., ¶ 26.) The data provided was a random sampling from 110 current employees of Defendant and 110 former employees of Defendant. (*Id.*) As indicated, Plaintiff's counsel calculated the delta between employees' punch in and shift start times, as well as their punch out and shift end times, which directly relate to Plaintiff's timeshaving causes of action pursuant to the FLSA and WWPCL. (*See id.*) As noted in the Court's Order, that would not directly pertain to Plaintiff's donning and doffing causes of action. (*See* ECF No. 23, at 6.) Instead, Plaintiff's counsel relied on information provided by Plaintiff to effectively create a range of damages utilizing their calculations pertaining to the 220 current and former employees' hours shaved, as well as an estimation of time spent donning and

doffing. (Walcheske Supp. Decl. ¶ 27.) Because employees' time spent donning and doffing was not captured by Defendant's timekeeping system, there was no physical data on which to rely. (*Id.*) Accordingly, Plaintiff assisted Plaintiff's counsel in "filling in the gaps," when creating their damages models as utilized during arm's length settlement negotiations. (*Id.*)

The third step Plaintiff's counsel took, as indicated, did not solely pertain to the class, which is an understandable reading of Attorney Walcheske's Declaration. Rather, Plaintiff's counsel extrapolated their calculations and the potential variances therein (with respect to minutes not recorded and those shaved) across both a three-year period as relates to the putative collective, and also a two-year period as relates to the class, utilizing liquidated damages of 100% in the collective extrapolation, and 50% in the class extrapolation. (*Id.* ¶ 28.)

Because court approval of settlements concerning FLSA collective actions are analyzed based on their overall "fairness,"[1] and do not carry the same Fed. R. Civ. P. 23 requirements applicable to class actions, including the "reasonableness, and adequacy of the settlement,"[2] counsel's Declaration simply focused on the extrapolation performed with respect to the putative class, rather than the putative collective. (*See* ECF No. 21, ¶ 18.) Thus, to clarify, Plaintiff's counsel created damages models concerning both the putative class *and* collective, not simply the class. (Walcheske Supp. Decl., ¶ 28.)

As to Plaintiff's counsel's use of the term "active headcounts" in relation to their extrapolations, in counsel's experience, using the number of current employees over a period of time is more appropriate when calculating damages than a "total headcount" over a period of time, which necessarily includes former employees and, at times, even individuals who were scheduled

---

[1] *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982)
[2] *McInnis v. Ecolab Inc.*, No. 11-02196, 2012 WL 892187, at *2 (D. Minn. Feb. 17, 2012), *report and recommendation adopted*, No. 11-2196, 2012 WL 892192 (D. Minn. Mar. 15, 2012)

to start on a particular day, but never reported for work. (*Id.* at ¶ 30.) As indicated, Plaintiff's counsel utilized "active headcounts" from two (2) different dates to further determine whether there was any meaningful change in the number of employees year over year, again in an effort to create a more "realistic" extrapolation, and then calculated their damages models utilizing those active employee headcounts. (*Id.* ¶ 29.)

By way of example, and not to state that this is what happened here, take a plant that has approximately 50 active employees each month in a calendar year, but employed a total of approximately 82 employees in that same calendar year. If Plaintiff's counsel determined that, on average, employees "lost" approximately five (5) minutes of compensable work time each shift as a result of unrecorded donning and doffing, as well as timeshaving, and thus approximately twenty-five (25) minutes per workweek, extrapolating that average over 50 active employees for that calendar year will be more representative of actual, potential damages, than extrapolating that average over 82 total employees in that same calendar year. (*Id.* ¶ 31.)

Given that Plaintiff's counsel was utilizing a representative data set for a percentage of the putative class and collective, counsel believed that creating damages models utilizing active employee headcounts was a reasonable method of estimating damages that would not unnecessarily overstate potential damages. (*See id.* ¶ 30.)

Plaintiff's counsel's fourth step in their analysis was effectively a culmination of the foregoing. Plaintiff's counsel combined a range of "shaved" minutes per shift obtained through their calculations from the representative sampling with a range of off-the-clock minutes spent donning and doffing minutes per workday as provided by Plaintiff, and extrapolated those results across the putative class and collective. (*See id.* ¶ 32.) Thus, counsel's underlying damages calculations created a range of potential damages, dependent upon the number of minutes "shaved"

and the number of off-the-clock minutes each shift. (*Id.*) This range is what was referenced as being between "approximately $1,000,000.00 and $3,000,000.00," which was also inclusive of liquidated damages, as indicated. (*Id.*; *see also* ECF No. 21, ¶ 6.) This range also assumed absolute or one hundred percent (100%) success on the merits and, thus, represented "the maximum potential damages" available. (ECF No. 21, ¶ 6.)

To account for a range of procedural outcomes and their potential effect on available damages (effectively varying levels of potential success), Plaintiff's counsel further factored in various risks present in this litigation that could ultimately impact damages. (Walcheske Supp. Decl., ¶ 33; ECF No. 21, ¶ 8.) While there were no specific metrics tied to one specific outcome (for example, a fifty percent (50%) percent reduction if employees outside of Wisconsin were not included because of a failure to obtain conditional (and final) certification under the FLSA), percentages reflecting likelihood of success were utilized. (Walcheske Supp. Decl. ¶ 33.)

Specifically, Plaintiff's counsel created a range from 50% to 95% in 5% increments, but still assumed the inclusion of liquidated damages for calculation purposes (equating to a range between approximately $500,000.00 and $2,850,000.00, inclusive of liquidated damages). (*Id.*) During arm's length negotiations, Plaintiff's counsel was then able to reference these varying levels of success as a guidepost both when discussing matters with (and getting authorization from) Plaintiff and in its negotiations with Defendants' counsel. (*Id.*)

### B. Defendant's Counsel's Damages Modeling

Defendant began its damages analysis by examining Plaintiff's time and compensation data for her entire employment with Defendant from April 8, 2019, to April 26, 2022, as she did not work much longer than the allegedly applicable three-year statute of limitations period. (Cook Decl. ¶ 5.) Plaintiff's time data showed her daily punch times, paid times, and scheduled times.

Her pay data showed her daily compensation. A review of her time records revealed she generally punched in four minutes before her shift start and punched out within one minute of her shift end. (*Id.* ¶ 6.) Assuming Plaintiff could prove she started working immediately upon punching in and continued working until the minute she punched out, her rounding claim would average no more than five minutes per day. (*Id.*) This five-minute delta is inflated, however, because it takes, on average, two to three minutes to walk from the timeclock on the production floor to an assigned workstation. This walking time is not compensable under the Portal-to-Portal Act, so Defendant subtracted a conservative four-minute walking time (two minutes at the start of her shift and two minutes at the end of her shift) from her "rounding" average, reducing her alleged uncompensated time to a *de minimis* amount of one minute per day. (*Id.* ¶ 7.) Multiplying these minutes out over a two-year period, crediting overtime paid to weekly overtime owed, Plaintiff's potential damages, including liquidated damages totaled $274.00. (*Id.* ¶ 8.)

Although the putative class and collective covers 4,107 distinct employees, Defendant only has approximately 2,000 non-exempt production employees working for it at any given time across all four locations. (*Id.* ¶ 9.) To get an understanding of potential class- and collective-wide damages, based on Plaintiff's time and pay records alone, Defendant's counsel extrapolated Plaintiff's damages across 2,000 individuals for two years. (*Id.*) The total potential damages on Plaintiff's rounding claim across the class and collective totaled $548,000. (*Id.*)

Concerned that Plaintiff's individual damages may not be representative of the broader class, Defendant's counsel also calculated damages by utilizing a representative sample of the class and collective. (*Id.* ¶ 10.) The sample included data for a six-month period in 2021 for 220 randomly selected employees (110 who were active and 110 who were no longer with Defendant), which represented 10.6% of the total potential class and collective members at each of the plant

locations. (*Id*. ¶ 11.) The sample set included a proportional number of employees from each location:

| Location | Active Employees | Former Employees |
|---|---|---|
| Marathon | 40 | 40 |
| Medford | 30 | 30 |
| Mountain Home | 30 | 30 |
| Booneville | 10 | 10 |

(*Id*. ¶ 12.) Defendant's counsel calculated the time between punch in and start time and then between end time and punch out for each of these 220 employees over the six-month period. (*Id.* ¶ 13.) The average (allegedly) unpaid minutes between time clock punches at shift start and end times each day for the sample class was approximately four minutes per person, one minute less than Plaintiff's average. (*Id.*) Defendant's counsel then extrapolated (twice) across the entire collective and class using active employee headcounts on April 1, 2021 (2,108 employees) and May 19, 2022 (2,077 employees). (*Id.* ¶ 14.) Defendant's counsel did not use "total headcount" because that would assume all 4,107 class and collective members had worked for Defendant the entire two-year period. (*Id.*) Applying the same four-minute credit Defendant applied to Plaintiff's damages calculation, the average damages on an individual basis across the putative class and collective for a two-year period was just $224.53, approximately $50 less than Plaintiff's estimated damages. (*Id.* ¶ 15.) Total damages for the entire class and collective totaled $473,311. (*Id.*)

Comfortable that Plaintiff's individual damages of $274 (representing a two-year period on her rounding claim) extrapolated across the active employee count represented better than her best day in court, Defendant estimated its total potential liability at $548,000. (*Id.* ¶ 16.)

In both the individual and extrapolated damages model, Defendant's counsel assigned no damage numbers to the donning and doffing claim because of Defendant's strong defenses to collective and class certification, which are further addressed in subsections C and D, below.

### C.    Factors Causing the Differences Between Damages Estimates

The Parties' respective damages estimate diverge based on assumptions made, and three of these assumptions, in particular, are responsible for the significant gap.

#### 1.    Plaintiff assigned damages to her Donning and Doffing Claim; Defendant did not.

Plaintiff assigned damages to her donning and doffing claim. (*See* Walcheske Supp. Decl. ¶¶ 27, 32.) She assumed she would obtain class and collective certification on her donning and doffing claim and ignored the potentiality for certain positions and locations to be excluded from the class and collective. (*See id.* ¶ 34.) By way of example, although cold storage warehouse employees could punch in before they donned their protective gear and after they doffed the same, (ECF No. 21, ¶ 3), and, as such, would likely be carved-out from a donning and doffing class and/or collective, they were nonetheless assumed to be a part of the headcount utilized in Plaintiff's counsel's calculations. (*See* Walcheske Supp. Decl. ¶ 34.) Plaintiff's counsel made these assumptions and consciously ignored the multiple procedural hurdles and flaws in Plaintiff's claims as applied to the putative class and collective not because those hurdles or flaws were "minor" or "unrealistic," but rather out of an attempt to extract the greatest result possible for the putative class and collective. (*Id.*) Thus, Plaintiff's counsel's estimations and assumptions frankly reflect counsel's bias regarding the merits of Plaintiff's claims (and those of the putative class and collective) and Plaintiff's and their goal of benefitting as many employees as possible through this litigation. (*See id.*)

Defendant did not assign damages to Plaintiff's donning and doffing claim because (i) without a common policy or practice, the number of individualized inquiries necessary to resolve issues of liability made representation on a class or collective basis untenable, and (ii) time spent donning and doffing required protective gear was *de minimis*. (Cook Decl. ¶ 17.)

15

As to Defendant's first argument, claims for unpaid compensation for donning and doffing would require individualized, fact specific inquiries not proper for a class or collective action. Plaintiff's proposed class and collective would include approximately 4,000 current and former hourly production employees, whose donning and doffing practices varied significantly based on each employee's personal characteristics, job position, daily job duties, and personal preferences, in addition to which of the four different facilities the employee worked. For example, Plaintiff alleges she and all other hourly, non-exempt employees would put on "steel-toed shoes, earplugs, safety glasses, hairnets, uniforms, and lab jackets" before their shifts. (ECF No. 1, ¶ 51.) However, none of this protective gear was constant among the 4,000 putative class members. The eye protection varied among employees, consisting of safety glasses, goggles, or face shields, individually or in combination as circumstances require. And while plant employees were required to wear captive safety shoes, they could select from varying styles of safety shoes. Some styles naturally take less time to put on and take off than others. Additionally, only employees in processing areas were required to wear disposable hairnets and disposable ear plugs.  The lab jackets or smocks were only required in Booneville and Medford, but not in Marathon and only for about the first week of employment in Mountain Home. Thus, it is clear even at this early stage that the claims require individualized inquiry not amenable to a collective or class action or relief.

As for Defendant's second argument, even if Plaintiff could show all 4,000 current and former hourly production employees are similarity situated, Defendant's requirements do not violate the FLSA or WWPCL because any time spent donning and doffing is *de minimis.* Courts typically look at the following factors when analyzing whether time is *de minimis*: (1) the administrative difficulty of recording the additional time, (2) the aggregate amount of compensable time, and (3) the regularity of the additional work. *DeKeyser v. Thyssenkrupp Waupaca, Inc.*, 747

F. Supp. 2d 1043, 1055 (E.D. Wis. 2010). Here, these factors all weigh in favor of finding the donning and doffing time at Defendant *de minimis*.

To begin, it would be administratively difficult for Defendant to record the additional time spent donning and doffing. To do so, Defendant would have to keep track of which employees report to or leave work already wearing their uniforms. Moreover, supervisors would need to take on the additional responsibility of limiting socializing and lollygagging while employees are in the locker rooms, washing their hands, and walking through the foot bath. Although Defendant could conceivably move the time clocks from the production floors to near the facility entrances, that move alone would not provide a picture of what quantity of time is actually spent performing compensable work.

Second, Plaintiff failed to allege how much time she spent donning and doffing. Defendant estimated an employee spent no more than five minutes per day on such activities. "Most courts have found daily periods of approximately 10 minutes *de minimis* even though otherwise compensable." *Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir. 1984) (citing cases). Thus, half of that time surely is *de minimis* here.

Third, the additional work was not consistent every day. Employees may wear different protective gear depending on their personal characteristics, preferences, or job duties that day. Employees may choose to put on their uniforms at home some days but change at the facility on other days. For all these reasons, even if Plaintiff managed to show employees are subject to a common policy, it does not violate the FLSA or WWPCL because such time spent donning and doffing is *de minimis*.

### 2. Plaintiff calculated a three-year statute of limitations; Defendant calculated two years.

Plaintiff's counsel's damage modeling further assumed the application of a three-year statute of limitations for purposes of the putative collective. (Walcheske Supp. Decl., ¶ 28.) Conversely, Defendant utilized a two-year statute of limitations on the basis Plaintiff could not prove a willful violation. (ECF No. 21, ¶ 3.) Expanding Defendant's damage model from two to three years would have increased its $548,000 estimate of potential total damages. Likewise, reducing Plaintiff's damage model from three years to two years would have decreased her $1,000,000 to $3,000,000 estimate of maximum potential total damages.

### 3. Defendant applied a four-minute Portal-to-Portal; Plaintiff did not.

Defendant's damage model applied a four-minute credit in reliance on the Portal-to-Portal Act. Plaintiff did not apply a similar credit, thereby explaining another significant factor causing the Parties' respective damage models to diverge.

As explained in section B, above, Defendant took a daily credit from Plaintiff's alleged rounding damages for the time spent walking to and from her workstation. Defendant determined it took, on average, two to three minutes to walk from the timeclock on the production floor to an assigned workstation. It is Defendant's position that this is not compensable time under the Portal-to-Portal Act, and Plaintiff would not otherwise be able to prove that she started working immediately upon punching in and continued working until the minute she punched out. (Cook Decl. ¶ 7.)

Plaintiff did not apply any credit under the Portal-to-Portal Act, contending that such time is automatically compensable because employees don and doff protective gear prior to punching the time clock. (*See* Walcheske Supp. Decl., ¶ 34.)

D.     **The Parties Reached a Justifiable Settlement Based on the Factual and Legal Issues in Dispute and Potential Impact of Those Issues on Liability.**

The Parties reached a Gross Settlement Amount that reflects the alleged damages and justifiable assumptions regarding the potential outcome had the parties decided to litigate this case to conclusion. To be clear, the Parties believe the settlement presented to the Court for preliminary approval is a fair, just, and equitable resolution to Plaintiff's claims on a class and collective basis, given the legal and factual issues in dispute.

### 1.    Plaintiff's Rounding Claim

Plaintiff alleges that Defendant failed to pay its hourly, non-exempt employees (at straight or overtime rates) for time worked immediately after punching in and before punching out because of the Defendant's timeclock rounding or so-called "shaving" practices. (ECF No. 1, ¶¶ 47, 48, 50, 100, 123, 145.) According to Plaintiff, Defendant rounded employees' actual hours worked to their scheduled shift start and end times (*Id*. ¶¶ 59, 66), despite requiring employees to be physically present and ready on the production line prior to their shift start (*Id*. ¶ 57), and to clock out only after their shift ends (*Id*. ¶ 60). She further alleges Defendant disciplined employees who were not on the production line by shift start or who clocked out prior to shift end. (*Id*. ¶¶ 58, 61.)

Defendant contends that Plaintiff's factual allegations do not accurately reflect Defendant's relevant timekeeping practices and related policies (*i.e.,* those prior to April 25, 2022). According to Defendant, it did not have an unlawful rounding policy because it did not actually round employees' work time. Instead, Defendant allowed a lawful grace period (varying by location) during which employees could punch in and out of work for their safety and convenience, and then disregarded those pre- and post- shift punches unless overtime had been specifically authorized.

19

This practice of disregarding pre- and post-shift punches is expressly permitted under the FLSA. The regulations specify:

> In those cases where time clocks are used, employees who voluntarily come in before their regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in any work. Their early or late clock punching may be disregarded.

29 C.F.R. § 785.48(a). "The mere act of clocking in before the start of a scheduled shift does not place the employer on notice that an employee begins to work before the scheduled start time." *Tom v. Generac Power Sys., Inc*., No. 17-C-1413, 2018 WL 3696607, at *5 (E.D. Wis. Aug. 3, 2018) (citing *Kellar v. Summit Seating Inc*., 664 F.3d 169, 177-78 (7th Cir. 2011)).

Defendant also takes the position that the number of individualized inquiries necessary to resolve issues of liability make class or collective representation untenable. To the extent Defendant's disregard of pre- and post-shift punches can be considered a rounding policy, claims for unpaid compensation would require individualized, fact specific inquiries not conducive to resolution on a class or collective basis. According to Defendant's records, Plaintiff's proposed class and collective would encompass approximately 4,000 current and former hourly production employees,[3] in up to 82 different jobs with widely varying job duties and work environments, at four different facilities with different timeclock practices, across three different shifts, reporting to at least 68 different supervisors and/or operations managers, and with varying motivations for allegedly working outside the shift. (Cook Decl. ¶ 4.)

Thus, whether, and to what extent, any employee is owed compensation for work outside the shift would depend on a myriad of different factors with differing results, including without limitation: (1) whether the employee engaged in work outside the shift; (2) the nature/type of work performed outside the shift; (3) the amount of work performed outside the shift; (4) whether the

---

[3] Each of the 4,000 current and former production employees could have anywhere from one to three jobs to perform.

work performed outside the shift was compensable work under the FLSA and WWPCL; (5) the employee's reason for violating company policy and working outside the shift; (6) whether Defendant knew or had reason to know the employee worked outside the shift; and (7) whether the claim is subject to other defenses (e.g., the work is *de minimis* or the given plaintiff's allegations lack credibility).

### 2. Plaintiff's Donning and Doffing Claim

Plaintiff also alleges that Defendant fails to pay all hourly, non-exempt employees (at straight and overtime rates) for (1) donning protective gear and other equipment both before and after clocking in but prior to their scheduled shift start times, and (2) doffing protective gear and other equipment after clocking out for their scheduled shift end times. (ECF No. 1, ¶¶ 56, 65, 111, 133, 145.) According to Plaintiff, her donning and doffing routines were similar, if not identical, to the routines of all other hourly, non-exempt employees. (*Id*. ¶¶ 53, 64.)

With respect to donning, Plaintiff alleges Defendant required hourly, non-exempt employees to arrive to the Defendant's premises and put on "food processing-related protective gear and other equipment, such as steel-toed shoes, earplugs, safety glasses, hairnets, uniforms, and lab jackets" before clocking in. (*Id*. ¶ 51.) Plaintiff alleges her daily routine prior to her scheduled start time proceeded as follows: arrive to work; physically enter the Defendant's building from the parking lot and walk to the locker room; put on food processing-related protective gear and other equipment in the locker room, such as steel-toed shoes, earplugs, safety glasses, a company-issued uniform, and a hairnet; leave the locker room and physically walk through double doors to put on a company-issued lab jacket; wash hands in the wash bay; clock in via the Defendant's electronic timekeeping system; put on safety gloves; and physically arrive at the line on the production floor prior to scheduled shift start time. (*Id*. ¶ 52.)

As for doffing, Plaintiff claims the Defendant required all hourly, non-exempt employees to clock out and then physically remove the food processing-related protective gear and other equipment, such as lab jackets, safety gloves, company-issued uniforms, hairnets, earplugs, safety glasses, and steel-toed shoes, prior to leaving the Defendant's premises. (*Id*. ¶ 62.) Plaintiff alleges her daily routine at her scheduled shift end time proceeded as follows: physically leave the line on the Defendant's production floor; clock out via the company's electronic timekeeping system; physically remove her food processing-related protective gear and other equipment, such as her lab jacket, safety gloves, company-issued uniform, hairnet, earplugs, safety glasses, and steel-toed shoes; wash and/or clean up; and physically leave the Defedant's premises for the day. (*Id*. ¶ 63.)

Defendant again contends Plaintiff's factual allegations do not accurately reflect Defendant's donning and doffing practices. Although Defendant did not have a uniform donning and doffing policy, Defendant maintained written policies under which some protective gear was required of all employees, while other gear varied based on the employee, the particular job task, and location. For example, all non-exempt plant employees were required to wear eye protection, captive safety shoes with red laces, and a company-issued uniform. Company-issued uniforms, however, could leave the plant and employees could choose whether to put the uniforms on at home or at work. Plaintiff had the option of putting her uniform on at home, prior to arriving at work.

The timing of when employees donned and doffed protective gear also varied by employee, task, and location. Non-exempt plant employees in processing areas generally, but not always, punched in after they put on their gear, washed their hands, and walked through the foot bath. However, some employees in processing areas put on a smock only after they punched in, and cold storage warehouse employees could punch in before they put on their Carhartt's. Similarly, non-

exempt plant employees in processing areas generally, but not always, punched out before they removed their gear. Employees could remove smocks before they punched out and cold storage warehouse employees could punch out after they removed their Carhartt's.

Defendants take the position that Plaintiff's donning and doffing claim, just like her rounding claim, faces an uphill battle because the proposed class and collective were not subject to a common policy that violates the FLSA or WWPCL and the time spent donning and doffing required protective gear is *de minimis*, both as previously addressed in section I.C.1, above.

### 3. Assessment of likelihood of prevailing on the merits.

With all the foregoing factual and legal issues in dispute, the Parties had to make their own assessment of potential liability after considering the relative strengths and weaknesses of Plaintiff's claims. As in any negotiated settlement, the Parties attribute different reasoning to the reasonableness of the settlement amount. From Plaintiff's perspective, the Parties' settlement reflects the likelihood Plaintiff achieves certification on its class and collective claims but accepts a calculated discount on its maximum potential damages, which assumes Plaintiff would prove willfulness and the absence of good faith by Defendant. From Defendant's perspective, the Parties' settlement reflects the likelihood Plaintiff achieves certification on its class and collective claims but accepts a damage enhancement for Plaintiff's donning and doffing claim and potential inability to apply a Portal-to-Portal credit as a result. Accordingly, the Parties' settlement, which was reached following extensive arms' length negotiations, is an appropriate, reasonable, and justifiable resolution given the factual and legal issues in dispute and the Parties' respective assessment of their likelihood of prevailing on the merits.

## II.    EQUITABLE TREATMENT OF MEMBERS

The Court's Order noted three concerns regarding this factor: (1) generally, the Parties' decision to base class member's allocations on the number of workweeks worked, (ECF No. 23, at 8); (2) the equality of monies allocated the collective's FLSA claims and the class's WWPCL claims, (*id.,* at 8-9); and (3) the amount of Named Plaintiff's Service Award. (*Id.*, at 9-10).

### A.    The Parties' Use of Workweeks Worked for Determining Individual's Recoveries Under Their Settlement Agreement is Reasonable

Each employee's pro-rata share was determined by the number of weeks the employee worked for Defendant from April 26, 2019, to April 26, 2022. Specifically, the Parties had hire and termination dates for the more than 4,000 former and current employees and used those dates to determine the number of weeks the employee worked for (*i.e.*, was employed by) Defendant. The distribution would have been substantially similar had the Parties used days worked based on the hire and termination dates. The Parties would have assumed 5 days worked per week, except for the week of hire and week of termination. The Parties did not use hours worked because that would have required further assumptions, such as each employee working eight hours per day.

The number of weeks employees worked sufficiently correlates to the amount of wages that were purportedly improperly deducted from their paychecks. All production employees worked under sufficiently similar timekeeping and donning/doffing policies. As described above, Defendant had a general practice of paying hourly production employees from shift start to shift end from at least April 26, 2019, until April 25, 2022, and required all production employees at all locations to don and doff at least some form of protective gear, including captive safety shoes.

### B.    The Allocation of the Net Settlement Fund Between Members of the Collective and Class is Reasonable

The Court's second concern was that the amounts allocated to the FLSA Collective from the Net Settlement Fund are equal to the amounts allocated to the WWPCL Class. (ECF No. 23, at 8-9.) This Court noted that "because of the procedural differences between the FLSA and Rule

23," there is "an incentive to exaggerate the worth of the FLSA claims at the expense of the state-law claims because amounts reserved to the FLSA claims are more likely to revert to Marathon." (*Id.*, at 9.) The Court's concerns in this regard are well-noted but were not a factor in the Parties' decision to allocate the Net Settlement Fund as they did.

In reaching their Settlement Agreement, the Parties agreed to resolve disputes concerning Plaintiff's causes of action for all hourly-paid production employees during the statutory period, not simply those employed at Plaintiff's specific facility or those locations in the State of Wisconsin. (*See* ECF Nos. 20, 22.) Thus, the Net Settlement Fund created through their Settlement Agreement is inclusive of payments not only to current and former employees of Defendant employed by Defendant in the State of Wisconsin, but also to current and former employees in the States of Mississippi and Idaho. (*See* ECF Nos. 20-1, 20-3.) However, individuals employed by Defendant in the States of Mississippi and Idaho are ineligible to participate in the WWPCL Class. (ECF No. 20-3.) Thus, there is no method by which the Parties' Settlement Agreement can apply to the non-Wisconsin employees or that non-Wisconsin employees can obtain the benefits of the Parties' Settlement Agreement without consenting to join the litigation, meaning there is no "default" by which they can participate in the same, unlike WWPCL Class members, who do not have to take any action to participate. (Walcheske Supp. Decl. ¶ 38.)

In addition, the damages available under the FLSA are generally far greater than those available under the WWPCL or another state's comparable law. (*Id.* ¶ 40.) As noted by this Court, while Plaintiff's causes of action pursuant to the WWPCL seek payment for all unpaid wages (and not simply overtime) owed (ECF No. 23, at 8), a significant amount of the unpaid wages as calculated were at an overtime rate of pay because Defendant's production employees typically worked very close to if not more than forty (40) hours each workweek. (Walcheske Supp. Decl.

¶ 40.) Coupling this with the higher rate at which damages accrue at an overtime rate of pay, a third year of potential damages, and the availability of liquidated damages that effectively doubles individual's potential damages,[4] quickly results in significantly greater damages available under the FLSA as compared to the WWPCL. (*Id.* ¶ 40.)

Given the totality of these considerations, the Parties effectively worked backward to ensure that class members received fair and adequate compensation in the event they chose not to opt-into the FLSA Collective. (*Id.* ¶ 39.) In other words, damages were allocated in the fashion presented in an attempt to be as fair as possible toward class members, while being sensitive to the fact that the Parties are seeking to include as many people as possible, which requires the participation of non-Wisconsin employees who stand to obtain nothing if they do not opt in. (*See id.*)

To accomplish this, and as a reflection of the "lesser" damages available under the WWPCL as compared to the FLSA, the Parties structured each individual's allocation as a maximum recovery, reflected in the "Total" column of Exhibit A to their Settlement Agreement. (*Id.*; ECF No. 20-1.) Individuals who consent to join the FLSA Collective are eligible to obtain at least that amount through the Parties' settlement, regardless of whether they worked in or outside of the State of Wisconsin. (Walcheske Supp. Decl., ¶ 39; ECF No. 20-1.) Non-Wisconsin employees who do not opt in are not covered by the Parties' Settlement Agreement and will not recover any monies, providing such individuals with a strong incentive to join the litigation and benefit from it.

---

[4] Liquidated damages in particular is a significant factor in potential damages in wages cases such as this. Under the WWPCL, such damages are not only less (50% as compared to 100%), but also are much more difficult to obtain because they necessitate a finding that a defendant acted willfully, whereas they are essentially presumed under the FLSA. (*See id.* ¶ 41.)

While WWPCL Class members could only conceivably recover two years of damages, rather than a possible three, and *at best* could obtain 50% liquidated damages, rather than the 100% available under the FLSA, they were nonetheless allocated, by default, at least half of their maximum recovery. (*See* Walcheske Supp. Decl., ¶ 39.) WWPCL Class members do not have to take any action in order to receive these amounts. Rather, all hourly-paid production employees in the State of Wisconsin during the statutory period are automatically included in the Parties' settlement and receive monies therethrough. (*See* ECF No. 20-2.)

Individuals who do not wish to be a part of the Class or the Parties' Settlement Agreement can request exclusion from the same and thereby are free to file their own lawsuits against Defendant if they so choose. (*Id.*) Further, WWPCL Class members who object to any of the terms of the Parties' Settlement Agreement are able to do so per the instructions set forth in the Parties' proposed Notice. (*Id.*) Thus, to the extent that any WWPCL Class member does not believe that his or her allocation is adequate, the Parties' Settlement Agreement affords them multiple means of expressing that disagreement. (*See id.*)

For all such reasons, the Parties believe that their method of allocating the Net Settlement Fund between the FLSA Collective and WWPCL Class is reasonable and adequate and is fair and reasonable to WWPCL Class members who choose not to opt-into the FLSA Collective.

## C.     Justification for Named Plaintiff's Service Award.

The Court next expresses concern with the proposed amount of Plaintiff's Service Award. (ECF No. 23, at 9-10.) Per the Settlement Agreement, Class Counsel intends to move the Court for an award of $20,000 from the Gross Settlement Amount as a service award for Plaintiff for the services she rendered in the lawsuit. (ECF No. 20, § II.B.2.) Defendant intends to oppose this motion and will do so in accordance with the Parties' Settlement Agreement (ECF No. 20) or as

otherwise ordered by this Court.

Notably, the Parties were unable to agree on an appropriate service award for Plaintiff but did not want that dispute to hold up the entire settlement. Accordingly, the Parties agreed to a Gross Settlement Amount of $950,000, inclusive of all regular and overtime wage damages, liquidated damages, service award, and attorneys' fees and costs. (*Id.*, § II.A.) To the extent the Court approves a service award in an amount less than $20,000, the difference between the service award and $20,000 will be added to the Net Settlement Fund to be distributed on a pro rata basis to the putative class and collective. (*Id.*, § II.B.4.)

Nevertheless, pursuant to the Court's request, the following previews the arguments Plaintiff intends to offer in support of her motion for approval of the service award:

"Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit." *Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir. 1998) (approving service award of $25,000); *see also In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 571 (7th Cir. 1992) ("Since without a named plaintiff there can be no class action, such compensation … may be necessary to induce him to participate in the suit…."). Because of this, "[c]ourts have recognized the importance of incentive awards for class representatives in many cases." *Spicer v. Chi. Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1267 (N.D. Ill. 1993) (collecting cases and approving service awards totaling $30,000.00).

As well-summarized by the United States District Court for the Northern District of Illinois, Eastern Division:

> Plaintiffs in class and collective actions play a crucial role in bringing justice to those who would otherwise be hidden from judicial scrutiny. 'Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit.' *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). This is especially

true in employment litigation. *See Velez v. Majik Cleaning Serv., Inc.*, No. 03 Civ. 8698, 2007 WL 7232783, at *7 (S.D.N.Y. June 25, 2007) ('[I]n employment litigation, the plaintiff is often a former or current employee of the defendant, and thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers.') (quoting *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 187 (W.D.N.Y. 2005) (internal quotation marks omitted)); *see generally* Nantiya Ruan, *Bringing Sense to Incentive Payments: An Examination of Incentive Payments to Named Plaintiffs in Employment Discrimination Class Actions*, 10 Emp. Rts. & Emp. Pol'y J. 395 (2006).

Incentive awards serve the important purpose of compensating plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiffs. *See, e.g., Espenscheid*, 688 F.3d at 876-77 (Posner, J.); *Cook*, 142 F.3d at 1016; *Massiah v. MetroPlus Health Plan, Inc.*, No. 11 Civ. 5669, 2012 WL 5874655, at *8 (E.D.N.Y. Nov. 20, 2012); *cf. Follansbee v. Discover Fin. Servs., Inc.*, No. 99 Civ. 3827, 2000 WL 804690, at *7 (N.D. Ill. June 21, 2000) (recognizing the importance of incentive awards). Accordingly, incentive awards are commonly awarded to those who serve the interests of the class. *Massiah*, 2012 WL 5874655, at *8 (collecting cases); *accord Chesemore v. Alliance Holdings, Inc.*, No. 09 Civ. 413, 2014 WL 4415919, at *4 (W.D. Wis. Sept. 5, 2014); *Hawkins v. Securitas Sec. Servs. USA, Inc.*, 280 F.R.D. 388, 395 (N.D. Ill. 2011).

*Briggs v. PNC Fin. Servs. Grp., Inc.*, No. 15-cv-10447, 2016 WL 7018566, at *2 (N.D. Ill. Nov. 29, 2016).

These awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009). Factors to consider when reviewing the amount of the award include "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class [and collective] has benefitted from those actions, and the amount of

time and effort the plaintiff expended in pursuing the litigation." *Cook*, 142 F.3d at 1016.

Here, Plaintiff assumed significant risks in bringing her claims as the only named plaintiff: "if the class action suit fails, no incentive award will be made," *Espenscheid v. DirectSat USA, LLC,* 688 F.3d 872, 876 (7th Cir. 2012), and "should the suit fail, [s]he may find h[er]self liable for the defendant's costs or even, if the suit is held to have been frivolous, for the defendant's attorneys' fees." *Id.* "The incentive reward is designed to compensate h[er] for bearing these risks, as well as for any time…participating in the litigation as any plaintiff must do." *Id.* at 877.

Increasing the risks undertaken by Plaintiff is that she was still actively employed at Defendant at the time of commencing this litigation on April 26, 2022. (*See* ECF No. 1, ¶¶ 27, 30.) In so doing, Plaintiff undertook this litigation on behalf of Defendant's current and former hourly-paid production employees with the knowledge that she could face retaliation for the same.

Given that Plaintiff is the only plaintiff in this litigation and, as of the time the settlement was reached between the parties was also the only individual who had consented to join this litigation, her counsel was reliant on her, her input, and her knowledge of Defendant, Defendant's policies, her work requirements and habits, and those of other hourly-paid production employees in prosecuting this litigation. (*See id.* ¶ 19.)

As briefly noted herein, and as will be described in further detail in her motion for approval of her Service Award, Plaintiff came forward with information concerning her compensation at Defendant, provided her counsel with information and documents supporting those concerns, and was heavily involved in Plaintiff's counsel's pre-suit investigation of her claims. (*See* Walcheske Supp. Decl., ¶¶ 20-21.) The information plaintiff provided later translated into her Complaint (ECF No. 1), and the allegations and causes of action asserted therein. (*Id.* ¶ 24.) Plaintiff further provided information utilized in the creation of Plaintiff's counsel's damages model, (*id.* ¶¶ 27,

32), and was involved in settlement negotiations, including the provision of settlement authorizations to her counsel. (*See id*. ¶ 33.)

Ultimately, Plaintiff approved and agreed to the final terms of the Parties' Settlement Agreement. As memorialized in the terms of that Agreement, Plaintiff's acceptance of the settlement was not conditioned or dependent upon any special treatment. Rather, she agreed that Defendant could oppose her requested Award, and that this Court would ultimately decide the amount of any Award to her. (*See* ECF No. 20, § II.B.2.) Unlike other unclaimed or unused settlement funds, any amount of her requested Award that is not approved does not revert to Defendant, but rather is redistributed to the collective and class. (*Id.*, § II.B.4.) Finally, (dis)approval of her Service Award does not influence or change the effectiveness of the agreement or her agreement to its terms.

In light of the foregoing, which, again, Plaintiff intends to expand upon in her Service Award approval motion, Plaintiff believes that she is deserving of a Service Award in the requested amount. Further, she intends to show that she performed similar duties as class representatives who received sizable awards approved by courts in this Circuit, that the amount of the Award is in line with awards approved by Wisconsin District Courts in cases with similar (and lesser) gross settlement amounts, and that the percentage of her requested Service Award as compared to the Gross Settlement Amount is comparable to, if not less than, service awards approved in this Circuit, this Court, this District, and the Eastern District of Wisconsin.

Pursuant to the terms of the Parties' Settlement Agreement, in addition to Defendant's challenge to Plaintiff's Service Award, any FLSA Collective member or WWPCL Class member can object to the Service Award, which remains subject to this Court's ultimate approval.

### III.     NOTICE TO CLASS AND COLLECTIVE

The Court only had one objection to the content of the notices to the class and collective, which is that they do not identify what each employee's share of the settlement is. (ECF No. 23, at 12.) In recognition of the Court's concern, the Parties have revised the notices to the class and collective (Exhibits B and C to the Settlement Agreement) to state that the participating employees "will recover at least [INSERT AMOUNT]." This addition is found in "Payments to Participants" under Section 1 of the notices. The Parties will cause Rust Consulting to insert in each employee's notice the corresponding amount in Exhibit A to the Settlement Agreement. The revised notices are attached hereto as Exhibits 1 and 2.

Moreover, and pursuant to the Court's request, Rust Consulting has provided a declaration that outlines in detail the process it will follow to distribute the notices to the class and collective. (*See* Decl. of Eric Bishop.)

### IV.     NOTICE TO OFFICIALS

Finally, the Court notes the Parties do not address Defendant's obligation to provide notice of the class settlement to certain state and federal officials under 28 U.S.C. § 1715(b). Although not previously detailed in the Parties' joint motion for preliminary approval, Defendant intends to cause the settlement administrator to provide notice of the class settlement in accordance with the Class Action Fairness Act and already obtained a quote for this service. Defendant will cause the appropriate notice to be provided as soon as practicable following preliminary approval of the settlement and appointment of Rust Consulting as the Settlement Administrator. (Cook Decl. ¶ 19.) The parties respectfully request that the Court schedule a Fairness Hearing approximately 120 days following a preliminary approval order, to account for both the notice period for putative

collective members to opt-in and putative class members to opt-out, and the 90-day waiting period under 28 U.S.C. § 1715(d).

## **CONCLUSION**

For all the reasons stated in the Parties' Joint Motion for Preliminary Approval and this Renewed Motion, the Parties respectfully request the Court grant preliminary approval of the Parties' Settlement Agreement.


Dated this 4th day of March, 2024.

**WALCHESKE & LUZI, LLC**
Counsel for Plaintiff

 s/ *James A. Walcheske*
James A. Walcheske, State Bar No. 1065635
Scott S. Luzi, State Bar No. 1067405
David M. Potteiger, State Bar No. 1067009
WALCHESKE & LUZI, LLC
235 North Executive Drive, Suite 240
Brookfield, Wisconsin 53005
Email: jwalcheske@walcheskeluzi.com
Email: sluzie@walcheskeluzi.com
Email: dpotteiger@walcheskeluzi.com
Telephone: (262) 780-1953
30750199.6

**GODFREY & KAHN, S.C.**
Counsel for Defendant

 s/ *Erin M. Cook*
Josh Johanningmeier, State Bar No. 1041135
Erin M. Cook, State Bar No. 1074294
Sarah K. Mueller, State Bar No. 1114561
GODFREY & KAHN, S.C.
833 E. Michigan Street, Suite 1800
Milwaukee, Wisconsin 53203
Email: jjohanningmeier@gklaw.com
Email: mcook@gklaw.com
Email: smueller@gklaw.com
Telephone: (414) 273-3500