UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

KARRIE ACKLEY,
on behalf of herself and
all others similarly situated,

      Plaintiff,                                        Case No. 22-cv-232

    v.

MARATHON CHEESE CORPORATION,

      Defendant.

## SUPPLEMENTAL DECLARATION OF JAMES A. WALCHESKE

    I, James A. Walcheske, certify under penalty of perjury that the following is true and correct to the best of my knowledge and recollection:

    1.    The statements set forth in this Declaration are made of my own personal knowledge and, if called as a witness, I could and would testify competently to the matters stated below.

    2.    I am lead counsel for the Plaintiff in this matter.

    3.    I was admitted to the Bar of the State of Wisconsin in 2008. I am also admitted to practice before the United States District Courts for the Eastern and Western Districts of Wisconsin and the Northern District of Illinois, as well as the United States Court of Appeals for the Seventh Circuit and the United States Supreme Court. Most of my professional time and efforts have involved representing employees in employment matters, particularly wage and hour matters.

    4.    I worked as an Associate for the employment law firm of Carroll & McDonald, LLC from approximately January 2008 to October 2009. I worked as an Associate for the

employment law firm of Heins Law Office LLC from approximately October 2009 to March 2012. I started my own law practice with Attorney Scott S. Luzi in March 2012. I am the co-founder and Managing Partner of Walcheske & Luzi, LLC.

5. I am a member of the Wisconsin Employment Lawyers Association ("WELA"), the National Employment Lawyers Association ("NELA"), and the Labor and Employment Law Section of the Wisconsin State Bar.

6. I am a frequent speaker on wage and hour laws and issues. As examples, this past year I addressed "Wage & Benefit Issues" in the presentation "Wisconsin Human Resource Law: What You Need to Know" as offered by the National Business Institute ("NBI"). In 2020 and 2021, I similarly addressed "FLSA Essentials: Practically Applying the Most Recent Legal Perspectives" as part of NBI's "Human Resource Law Boot Camp." I have also presented to numerous business organizations and groups regarding wage and hour issues, and have also been involved in management training sessions for the City of Appleton, among other engagements.

7. I was named a "Rising Star" in employment litigation from 2012 to 2021, and a "Super Lawyer" in the same field in 2022 and 2023 by Thomson Reuters.

8. I was named in the "Best Lawyers in America" from 2018 to 2023 by U.S. News & World Report. Similarly, my firm was named in the "Best Law Firms in America" in the areas of "Employment Law – Individuals," and "Litigation – Labor and Employment," from 2018 to 2023.

9. Throughout my years of practice, I have represented hundreds of individuals and employees in employment law matters, including matters to recover unpaid wages under both state and federal law. My law practice for my entire professional career has been devoted to employment law, including wage and hour litigation in federal court.

10. I have successfully represented numerous plaintiffs in individual and class/collective action wage and hour matters in the United States District Courts for the Eastern and Western Districts of Wisconsin. I believe that I am experienced with complex federal wage and hour litigation based on this experience.

11. Indeed, recently, Attorney David M. Potteiger and I filed an *Amici Curiae* Brief in the United States Court of Appeals for the Seventh Circuit in support of the Plaintiff-Appellee and on behalf of NELA and WELA, in a complex wage and hour matter arising out of litigation before this Court (*Vanegas v. Signet Builders, Inc.*, Case No. 21-cv-0054-jdp).

12. While our firm does not maintain statistics concerning the litigation we have handled over the years, statistics concerning the federal court litigation in which I have been counsel (though not necessarily *lead* counsel) is available through Westlaw. According thereto, I have been counsel in approximately 538 federal court cases, 383 of which involved wage claims, and 258 of which were class actions.

13. Attached hereto as Exhibit 1 is a true and correct copy of the "Litigation Analytics Report for James A. Walcheske" as created and maintained by Westlaw.

14. Attached hereto as Exhibit 2 is a true and correct copy of the "Litigation Analytics Report for James A. Walcheske," as limited to Fair Labor Standards Act cases, and as created and maintained by Westlaw.

15. Notably, of the 383 federal court wage claims in which Attorney Walcheske was counsel, 145 involved settlements that were presented for court approval. I am aware that no objections were received in response to any of those settlements, all of which ultimately received final approval.

16. Attached hereto as Exhibit 3 is a true and correct copy of the "Litigation Analytics Report for James A. Walcheske," as limited to settled Fair Labor Standards Act cases, as created and maintained by Westlaw.

17. Our firm is incredibly experienced in notice and settlement administration. Indeed, our firm has directly handled administration in a number of cases and also maintains a subscription to PeopleMap for purposes of obtaining alternative contact information for class members.

18. In class/collective litigation in which I am lead counsel (and oftentimes in other class/collective litigation as well), I make myself available to putative class/collective members via phone, email, and text. Our firm's Legal Assistant also dedicates a significant amount of her time to communicating with and addressing the questions of putative class/collective members.

19. Because Plaintiff Karrie Ackley is our only plaintiff in this litigation, we were heavily reliant on her and the information she possessed in order to develop, bring, and prosecute her causes of action against Defendant.

20. Prior to bringing suit against Defendant, our firm engaged in a pre-suit investigation of Plaintiff's potential claims against Defendant by meeting and speaking with Plaintiff and reviewing information she provided to us, including copies of her Earnings Statements and images of Defendant's "Clock Cards" policy and "Attendance Policy." These images were obtained from Defendant's workplace at our request (they were posted in Defendant's facility).

21. Our review of Plaintiff's records with her allowed us to get a better understanding of the effect of Defendant's timekeeping system (with respect to not only the amount of time "shaved," but also the net effect of that timeshaving in addition to not including her time spent donning and doffing) on her hours worked and, ultimately, her compensation.

22. Independent of Plaintiff, and as part of our pre-suit investigation, we also investigated Defendant, generally, including reviewing publicly available information concerning its operations and locations.

23. Based upon our pre-suit investigation, we determined that there was a reasonable basis to believe that Plaintiff and other hourly-paid production employees were similarly situated, in that they were uniformly subject to Defendant's policies and practices concerning timekeeping and compensation, specifically, timeshaving (via electronic timeclock rounding) and failure to compensate employees for time spent donning and doffing and engaging in required food safety procedures.

24. The information we obtained, most of which came from Plaintiff, later translated into Plaintiff's Complaint, ECF No. 1, and the allegations and causes of action asserted therein.

25. During the litigation, we further investigated the underlying merits of Plaintiff's causes of action, as well as the potential damages flowing therefrom, based on documents and information concerning Defendant's policies, locations, and the employees at those locations, as well as tens of thousands of rows of timekeeping data pertaining to Plaintiff and other hourly-paid production employees of Defendant.

26. The timekeeping data we analyzed was provided by Defendant and related to a random sampling of 220 employees, 110 of which were current employees, and 110 of which were former employees.

27. Because Defendant's production employees did not physically track their hours spent donning and doffing protective equipment and engaging in other safety activities, any time attributable to the same was not maintained in Defendant's timekeeping data. As a result, we relied on information provided by Plaintiff to effectively create a range of damages utilizing our

calculations pertaining to the 220 current and former employees' hours shaved, as well as an estimation of time spent donning and doffing. Effectively, Plaintiff helped to "fill in the gaps" when creating our damages models.

28. In creating our damages models, we extrapolated our calculations and the potential variances therein (with respect to minutes not recorded and those shaved) across both a three-year period as relates to the putative collective, and also a two-year period as relates to the class, utilizing liquidated damages of 100% in the collective extrapolation, and 50% in the class extrapolation.

29. That extrapolation was created utilizing "active headcounts," rather than a "total headcount." Specifically, we utilized "active headcounts" from two (2) different dates to further determine whether there was any meaningful change in the number of employees year over year, again in an effort to create a more "realistic" extrapolation.

30. In my experience, using the number of active or current employees over a period of time is more appropriate when calculating damages than a "total headcount" over a period of time, which necessarily includes former employees and, at times, even individuals who were scheduled to start on a particular day, but never reported for work. This can result in an overstatement of damages, which can further lead to having to conduct additional calculations and information exchanges that further delay parties' progress toward a resolution.

31. As an example of the difference between utilizing "active headcounts," as comparted to ta "total headcount," and not to state that this is what happened here, but take a plant that has approximately 50 active employees each month in a calendar year, but employed a total of approximately 82 employees in that same calendar year. If Plaintiff's counsel determined that, on average, employees "lost" approximately five (5) minutes of compensable work time each shift

as a result of unrecorded donning and doffing, as well as timeshaving, and thus approximately twenty-five (25) minutes per workweek, extrapolating that average over 50 active employees for that calendar year will be more representative of actual, potential damages, than extrapolating that average over 82 total employees in that same calendar year.

32. After we extrapolated our damages to the putative collective and class, we effectively combined all of our data to create a range of potential damages, dependent upon the number of minutes "shaved" and the number of off-the-clock minutes each shift as calculated using Defendant's representative sampling (as to the "shaved" time) and information provided by Plaintiff as to donning and doffing. That range was approximately $1,000,000 to $3,000,000, inclusive of liquidated damages.

33. To account for different, potential procedural outcomes and their potential effect on available damages (effectively varying levels of potential success). While there were no specific metrics tied to one specific outcome (for example, a fifty percent (50%) percent reduction if employees outside of Wisconsin were not included because of a failure to obtain conditional (and final) certification under the FLSA), percentages reflecting likelihood of success were utilized. Specifically, I created a range of 50% to 95% of the maximum potential amount of between $1,000,000 and $3,000,000 in 5% increments, equating to a range between approximately $500,000 and $2,850,000, inclusive of liquidated damages. During settlement negotiations, I then referenced these figures as a guidepost when discussing matters with (and getting authorization from) Plaintiff, and also in our negotiations with Defendant's counsel.

34. I (and Plaintiff) understood during negotiations that our damages model was significantly different than Defendant's, given the assumptions we made in our underlying calculations when crafting our maximum potential damages. This included, but not was not limited

to, assumptions that: all facilities were included; all hourly-paid production employees in all potentially eligible job positions were included; collective and class certification would be granted; that all hourly-paid production employees eligible to participate in the collective and class did so; all minutes shaved and not recorded were compensable in nature (and the further assumption that employees' workdays started at the time they began donning and ended at the time they ceased doffing protective equipment each workday); and that, effectively, Plaintiff, the class, and collective ultimately succeeded at trial and recovered compensation for all time potentially at issue in this litigation. While there were many procedural hurdles and "flaws" to Plaintiff's claims (for example, the individualized differences between the time spent donning and doffing, to the extent all individuals were required to do so in the first instance), we consciously ignored them, not because they were "minor" or "unrealistic," but because we (our firm and Plaintiff) sought to extract the greatest result possible for the greatest number of people possible.

35. Based on all of the information gathered prior to filing and during the life of this litigation, we continue to believe in the merits of Plaintiff's causes of action as asserted in her Complaint, and that the causes of action asserted and prosecuted in this litigation appropriately encapsulate the alleged violations of the FLSA and WWPCL, such that the Parties' Settlement Agreement resolves all disputes arising thereunder.

36. During the parties' settlement negotiations, and as a compromise to the parties' (many) disputes concerning Plaintiff's donning and doffing claims, the parties agreed to end the class and collective periods applicable to Plaintiff's donning and doffing claims on April 26, 2022, but to release claims associated with the same through the date of final approval.

37. During settlement negotiations, the parties also discussed the appropriateness of Plaintiff being a representative for employees employed by Defendant in the States of Mississippi

and Idaho. They ultimately agreed that, despite the variations in practices between Defendant's locations, the nature of the alleged harm is the same: Defendant's alleged failure to fully compensate its production employees by unlawfully rounding hours worked and failing to compensate them for time spent donning and doffing. The rounding claims Plaintiff pursued against Defendant pertained to its general rounding practice utilized across all of its locations through April 25, 2022. Similarly, Plaintiff's donning and doffing claims are based on Defendant's requirement that all production employees at all locations don and doff at least some form of protective gear each workday.

38.     In reaching their Agreement, the parties agreed to include Defendant's hourly-paid production employees who did not work in the State of Wisconsin in their settlement. Because such individuals worked outside of Wisconsin, they are ineligible to participate in the WWPCL Class, which essentially results in their inability to receive any monies through the settlement "by default." Instead, if they would like to participate in and benefit from the parties' Settlement Agreement, they to affirmatively opt-into the litigation and join the FLSA Collective.

39.     Given this, we had to balance incentivizing individuals to join the FLSA Collective and, thereby, participate in the parties' Settlement Agreement, with being as fair as possible to WWPCL Class members who choose not to opt-into the FLSA Collective. In order to do so, we effectively worked backward from the total, anticipated Net Settlement Fund amount, calculating each person's "maximum" recovery, which is reflected in the "Total" column of Exhibit A to the Settlement Agreement. Individuals who consent to join the FLSA Collective are eligible to obtain at least that amount through the parties' settlement, regardless of whether they worked in or outside of the State of Wisconsin. WWPCL Class members are then allocated, by default, at least half of their maximum recovery, as is also reflected in Exhibit A to the Settlement Agreement.

40. The Net Settlement Fund was allocated in the manner described above in an attempt to ensure fairness to all participants. The damages available under the FLSA are generally far greater than those available under the WWPCL or another state's comparable law. That is particularly true in situations like that presented here, where a significant amount of the unpaid wages as calculated were at an overtime rate of pay because Defendant's production employees typically worked very close to if not more than forty (40) hours each workweek. Coupling this with the higher rate at which damages accrue at an overtime rate of pay, a third year of potential damages, and the availability of liquidated damages that effectively doubles individual's potential damages, quickly results in significantly greater damages available under the FLSA as compared to the WWPCL.

41. Liquidated damages in particular causes a significant disparity in potential damages in cases such as this, where, facially, there is no evidence suggesting that Defendant's conduct was willful in nature, drastically reducing, if not completely eliminating, the potential for liquidated damages pursuant to the WWPCL.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 4th day of March, 2024.

    *s/ James A. Walcheske*
    James A. Walcheske