UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

KARRIE ACKLEY,
on behalf of herself and
all others similarly situated,

      Plaintiff,                                            Case No. 22-cv-232

      v.

MARATHON CHEESE CORPORATION,

      Defendant.

---

**DECLARATION OF JAMES A. WALCHESKE IN SUPPORT OF MOTIONS**

---

I, James A. Walcheske, certify under penalty of perjury that the following is true and correct to the best of my knowledge and recollection:

1. The statements set forth in this Declaration are made of my own personal knowledge and, if called as a witness, I could and would testify competently to the matters stated below.

2. I am an attorney licensed to practice in this Court and in the State of Wisconsin. I am the lead attorney for Plaintiff Karrie Ackley.

3. I was admitted to the Bar of the State of Wisconsin in 2008. I am also admitted to practice before the United States District Courts for the Eastern and Western Districts of Wisconsin and the Northern District of Illinois, as well as the United States Court of Appeals for the Seventh Circuit and the United States Supreme Court. Most of my professional time and efforts have involved representing employees in employment matters, particularly wage and hour matters.

4.  I worked as an Associate for the employment law firm of Carroll & McDonald, LLC from approximately January 2008 to October 2009. I worked as an Associate for the employment law firm of Heins Law Office LLC from approximately October 2009 to March 2012. I started my own law practice with Attorney Scott S. Luzi in March 2012. I am the co-founder and Managing Partner of Walcheske & Luzi, LLC.

5.  I am a member of the Wisconsin Employment Lawyers Associations, the National Employment Lawyers Association, and the Labor and Employment Law Section of the Wisconsin State Bar.

6.  Throughout my years of practice, I have represented hundreds of individuals and employees in employment law matters, including matters to recover unpaid wages under both state and federal law. My law practice for my entire professional career has been devoted to employment law, including wage and hour litigation in federal court.

7.  I have successfully represented numerous plaintiffs in individual and class/collective action wage and hour matters in the United States District Courts for the Eastern and Western Districts of Wisconsin. I believe that I am experienced with complex federal wage and hour litigation based on this experience.

8.  I am familiar with the market rate in the Seventh Circuit and the State of Wisconsin for contingent fee representation of plaintiffs in Fair Labor Standards Act ("FLSA") and Wisconsin Wage Payment and Collection Law ("WWPCL") cases and I am familiar with a plaintiff's ability to recover reasonable attorneys' fees and costs as incurred in such litigation.

9.  The typical contingent fee rate in the Seventh Circuit ranges between approximately 33% and 40% of the total or gross settlement amount. In the State of Wisconsin, the "standard" market

rate for attorneys' fees in this type of litigation is one-third or 33.33% of the total settlement amount, in addition to reimbursement of litigation and administration-related costs incurred.

        10.      District Courts in this State, including this Court, have consistently approved our requested attorneys' fees in the amount of one-third or 33.33% of the total or gross settlement amount in cases under the FLSA and WWPCL. *See, e.g., Hunt v. Greif, Inc., et al.,* Case No. 22-cv-980-bhl, ECF No. 50 (E.D. Wis. July 17, 2024); *Hoffman v. Inland Flexo, LLC*, Case No. 23-cv-103-wcg, ECF No. 31 (E.D. Wis. May 31, 2024); *Carr v. McCain Foods USA, Inc.,* Case No. 23-cv-1235-wcg, ECF No. 28 (E.D. Wis. May 31, 2024); *Jorgensen-Ziebert v. Agnesian Healthcare, Inc.*, Case No. 21-cv-302-la, ECF No. 33 (E.D. Wis. May 16, 2024); *McWilliams v. Skana Aluminum Co.*, Case No. 22-cv-1179-wcg, ECF No. 47 (E.D. Wis. Apr. 5, 2024); *Jacobson v. Milan Laser Corporate, LLC*, Case No. 21-cv-918-wcg, ECF No. 55 (E.D. Wis. Dec. 14, 2023); *Knuth v. Johnsonville, Inc.*, Case No. 21-cv-918-la, ECF No. 23 (E.D. Wis. Nov. 16, 2023); *Harrington v. Nemak USA, Inc.*, Case No. 22-cv-693-la, ECF No. 66 (E.D. Wis. Nov. 8, 2023); *Ciha v. Masters Gallery Foods, Inc.*, Case No. 21-cv-1405-scd, ECF No. 39 (E.D. Wis. Oct. 30, 2023); *Borden v. Encore Senior Living, LLC, et al.*, Case No. 22-cv-707-scd, ECF No. 36 (E.D. Wis. Oct. 30, 2023); *Sharpless v. Ki Mobility LLC*, Case No. 21-cv-816-jdp, ECF No. 57 (W.D. Wis. Sept. 29, 2023); *Kolbow, et al. v. API Heat Transfer Inc., et al.*, Case No. 22-cv-451-jps, ECF No. 50 (E.D. Wis. Aug. 21, 2023); *Solem v. McCain Foods USA, Inc.*, Case No. 22-cv-137-wcg, ECF No. 41 (E.D. Wis. Aug. 10, 2023); *Newman v. Luvata Appleton LLC*, Case No. 22-cv-942-wcg, ECF No. 39 (E.D. Wis. Aug. 7, 2023); *Schneider v. Copperleaf Management Group Inc.*, Case No. 22-cv-1161-bhl, ECF No. 43 (E.D. Wis. June 28, 2023); *Merschdorf v. DC Industries, Inc., et al.*, Case No. 19-cv-1037-jdp, ECF No. 47 (W.D. Wis. June 7, 2021).

11. As Managing Partner of Walcheske & Luzi, LLC, I am aware of and familiar with the work performed and rates charged by members of the firm.

12. During the entirety of the litigation, I billed for my services and Attorney Scott S. Luzi billed for his services at our usual and customary rates of $450.00 per hour. This is the rate we utilize in all legal matters and is the same rate charged to our fee-paying clients.

13. Through my involvement in the Wisconsin legal community, and particularly my interactions with other attorneys who practice in the area of labor and employment, I am familiar with the rates attorneys in Wisconsin charge for their work representing plaintiffs under the FLSA and WWPCL.

14. With respect to individual and collective and class action wage and hour cases, I believe that my and Attorney Luzi's hourly rates of $450.00 per hour are reasonable and representative of and consistent with the prevailing market rate in the Wisconsin legal community for similar services, including litigating wage and hour claims pursuant to both the FLSA and WWPCL.

15. Wisconsin District Courts that have been asked to consider and approve of our hourly rates of $450.00 per hour have consistently done so. *See, e.g., Hernandez v. Henkel US Operations Corporation*, Case No. 23-cv-192-la, ECF No. 29 (E.D. Wis. August 16, 2024); *Fritsch v. O'Brien Services, Inc.*, Case No. 21-cv-1152-la, ECF No. 53 (E.D. Wis. May 30, 2024); *Schuelke v. St. Joseph Residence, Inc., et al.*, Case No. 22-cv-112-wcg, ECF No. 54 (E.D. Wis. Mar. 15, 2024); *Berglund v. Matthews Senior Housing LLC, et al.,* Case No. 21-cv-108-pp, ECF No. 81 (E.D. Wis. Feb. 26, 2024); *Bertzyk v. StoneRidge Wholesale Div. LLC*, Case No. 21-cv-398-wcg, ECF No. 104 (E.D. Wis. Jan. 30, 2024); *Borden v. Encore Senior Living, LLC, et al.,* Case No. 22-cv-707-scd, ECF No. 36 (E.D. Wis. Oct. 30, 2023); *Sharpless v. Ki Mobility LLC*, Case No. 21-cv-816-jdp, ECF No. 57 (W.D. Wis. Sept. 29, 2023); *Mader v. Dental Crafters, Inc.*, Case No. 20-cv-676-jdp, ECF No. 35 (W.D. Wis.

Apr. 14, 2023); *Jordan v. Rexnord Indus., LLC*, Case No. 22-cv-29-bhl, ECF No. 34 (E.D. Wis. Mar. 14, 2023); *Malone v. Interflex Acquisition Company,* Case No. 22-cv-99-wcg, ECF No. 42 (E.D. Wis. Feb. 21, 2023); *Smith v. Ascension Health Senior Care, et al.*, Case No. 20-cv-421-bhl, ECF No. 110 (E.D. Wis. Sept. 29, 2022).

16. At the outset of this litigation, Plaintiff agreed to compensate our law firm with forty percent (40%) of any recovery, exclusive of costs, should a recovery be obtained. We also agreed to be responsible for all attorneys' fees and costs in the event of an adverse result.

17. Specifically, and with respect to attorneys' fees, our fee agreement with Plaintiff states, in part:

> W&L will receive from the opposing party the greater of 40% of the gross amount settled for, collected, or recovered for all damages arising out of said cause(s) of action against the opposing party or the actual amount of attorneys' fees and costs billed, settled for, allocated, and/or awarded arising out of said cause(s) of action against the opposing party.

With respect to costs, we agreed that "all necessary costs and disbursements…necessary to properly handle Client's cases will be paid by W&L," and we were then authorized "to deduct out of any settlement or recovery all unpaid costs due and owing to W&L."

18. As a firm, we structure our contingency agreements to have the "greater of" element because our potential attorneys' fees can vary greatly from case to case depending on a host of various factors and, thus, there is not a suitable "one size fits all" approach to our contingency fee arrangements.

19. Based on my experience representing plaintiffs in a number of collective and class actions pursuant to the FLSA and WWPCL, respectively, I believe such cases are typically complex and require a significant amount of time and, in some cases, expense to litigate. This is particularly true in a case such as this involving multiple causes of action potentially affecting

multiple facilities in multiple states employing thousands of employees (and, as such, putative collective and class members).

20. In agreeing to our fee arrangement with Plaintiff, our firm agreed to bear the entirety of the risk in the event there was no recovery resulting from the litigation. Specific to this litigation, Plaintiff (and thus Plaintiff's counsel) faced the risk of: not obtaining conditional certification under the FLSA or, alternatively, not obtaining conditional certification of all putative collectives or otherwise obtaining conditional certification on a more limited basis, such as limited to particular facilities; decertification of her conditionally certified collective(s); not obtaining class certification pursuant to Fed. R. Civ. P. 23 or, if granted, on a more limited basis than that pursued; employees at Defendant's facilities outside of the State of Wisconsin being excluded from any collective(s); employees who held certain positions being excluded from any collective(s) and/or class; the litigation or certain causes of action being dismissed at summary judgment; and not ultimately succeeding on the merits or, even then, of obtaining only partial or limited success as affected or reduced by Defendant's various defenses. Any number of these risks presented could have resulted in our firm being left solely responsible for all attorneys' fees and litigation-related costs incurred in litigating this matter.

21. In accordance with our contingent fee agreement with Plaintiff, to date our firm has not received any compensation for our time spent on the case or reimbursement for our litigation and administration-related costs.

22. Pursuant to the Parties' Settlement Agreement & Release ("Settlement Agreement"), our firm is seeking attorneys' fee award one-third (1/3) or 33.33% of the gross settlement amount of $950,000.00 or $316,666.67, inclusive of our costs. This is a voluntary reduction from the forty percent (40%) contingency fee agreed to with Plaintiff.

23. We voluntarily reduced our requested attorneys' fees award to ensure that a reasonable and adequate amount of the gross settlement amount was payable to the Settlement Class through the resulting Net Settlement Fund.

24. I believe that our requested attorneys' fees and costs of one-third or 33.33% of the gross settlement amount is consistent with our written fee agreement with Plaintiff, with common fund principles, with the rates approved by District Courts throughout the State of Wisconsin, and with the contingency rates utilized by other practitioners in this State in similar matters, such that it satisfies the "market-based approached" utilized when setting the percentage of a settlement fund to be awarded.

25. I am the custodian of our firm's billing records.

26. Attorneys at our firm records their billable hours in minimum units of one-tenth of an hour

27. Attached hereto as Exhibit 1 are true and correct contemporaneous billing records for Attorney Luzi and I with all entries relating to the parties' Renewed Joint Motion for Preliminary Approval, as well as all entries relating to Plaintiff's attorneys' fees and costs motion removed, as well as any entries that could be arguably characterized as "redundant" in that there was an overlap between my entries and those of Attorney Luzi.

28. As reflected in Exhibit 1, Attorney Luzi and I devoted approximately 228.5 hours to this litigation.

29. I believe that all work performed (and that we will continue to perform) was and is necessary in furtherance of the litigation and resolution, particularly in light of the risks Plaintiff (and we) faced in this case as summarized herein.

30. In approximately mid-April 2022, Attorney Luzi met and spoke with Plaintiff regarding her then-current employment at Defendant. Among Plaintiff's concerns at the time was her belief that she and Defendant's other hourly employees were not being compensated for their actual hours worked as a result of having to don and doff protective gear and engage in safety measures as part of their job duties before being able to clock in and after clocking out, and Defendant's rounding system.

31. After this initial discussion, Attorney Luzi worked with Plaintiff to obtain additional information and support for her potential wage claims against Defendant. As examples, he requested, and Plaintiff provided, Earnings Statements reflecting her hours of work as compensated and her compensation received (which facially appeared to validate Plaintiff's understanding of Defendant's timekeeping system and the rounding policy or practice in place at her location), and screenshots of written policies posted in Defendant's workplace, such as its "Clock Cards" policy and "Attendance Policy."

32. Additionally, Attorney Luzi asked Plaintiff to, and Plaintiff did provide, detailed explanations of her pre-shift and post-shift habits and requirements, as well as information concerning those of other hourly production employees as she directly observed.

33. Further, at Attorney Luzi's request, Plaintiff timed herself when donning and doffing protective gear in the workplace and provided such information to her counsel.

34. During our firm's pre-suit investigation, Attorney Luzi (initially) and I (later) investigated Defendant, generally, including publicly available information concerning its operations and locations, and records available through PACER to determine whether any similar federal wage claims were ongoing or had been previously filed against Defendant.

35. Notably, and to our knowledge, no other similar lawsuits have been filed.

36. Through our pre-suit investigation, we determined that there was a reasonable basis to belief that Plaintiff and other hourly-paid employees of Defendant were similarly situated, in that they were (at least likely to be) uniformly subject to Defendant's policies and practices concerning timekeeping and compensation, specifically, timeshaving (via electronic timeclock rounding) and failing to compensate employees for their time spent donning and doffing required protective gear and equipment and engaging in required food safety procedures.

37. The information obtained during our pre-suit investigation, including information provided to us by Plaintiff, translated directly into Plaintiff's Complaint as was filed in this District on April 26, 2022, as was reviewed and commented on (Plaintiff provided additional details and corrections as necessary) prior thereto.

38. In September 2022, and while engaging in formal discovery, Defendant's counsel provided us with a highly detailed analysis of Plaintiff's claims that set forth the results of their investigation of the same, as well as their positions challenging the merits of Plaintiff's claims and the appropriateness (or lack thereof) of collective and class treatment in this case. Defendant also produced timecards, written policies, headcounts, hours details, and employee lists pertaining to its locations.

39. Based on their analysis of Plaintiff's Rounding Claims, Defendant's counsel asserted that, assuming a collective/class was certified and totaled approximately 4,000 individuals, the maximum damages recoverable totaled approximately $548,000, inclusive of liquidated damages and utilizing a two-year statute of limitations.

40. Based on counsel's analysis of Plaintiff's Donning and Doffing Claims, in particular the number of defenses available relating to the same, Defendant did not assign any damages amount to those claims.

41. Over the course of the proceeding weeks, Plaintiff's counsel, Attorney Luzi reviewed and analyzed Defendant's timekeeping records and policies and began creating damages models and engaging in damages calculations.

42. Once Attorney Luzi concluded his initial analysis, I built upon the models and analysis Attorney Luzi conducted, manipulating the data to create a range of potential outcomes accounting for the wide range of variables in play in this litigation, such as varying locations, headcounts, time periods, and potential range of minutes per shift that were uncompensated because of Defendant's varying policies and practices, as well as variances in employees' individual habits, as well as the specific requirements of their positions in relation to the type of personal protective equipment and safety-related activities they were required to perform.

43. During this process, Attorney Luzi and I also worked with Plaintiff to incorporate her estimates of her time spent donning and doffing required gear and equipment and engage in food-safety related activities to "flesh out" their damages model to ensure that all potential hours worked and work performed were captured by the same. Plaintiff further provided "counterpoints" to Defendant's arguments concerning the alleged *de minimis* nature of the same, including her understanding and personal knowledge of the time similarly spent by other hourly production employees performing such same tasks.

44. Based on our analysis, we believed that the maximum damages flowing from both Plaintiff's Rounding Claims and her Donning and Doffing Claims totaled between approximately $1,000,000 and $3,000,000, assuming 100% of all putative collective members (at all of Defendant's locations) participated in the collective, no class members requested exclusion from the class, complete success on the merits of both claims in relation to the collective and class, utilization of a three-year statute of limitation, and 100% liquidated damages on all overtime wages

owed, as well as 50% liquidated damages on all straight-time or agreed-upon wages owed to the class.

45. We knowingly made such assumptions and ignored the procedural hurdles and flaws in Plaintiff's claims as applied to the putative collective and class in accordance with their intent to obtain the most beneficial result possible for Plaintiff and for all others who may be able to participate in the parties' settlement, should one be reached. It was also in accordance with Plaintiff's directive and expectation that we do so and include as many current and former hourly-paid production employees as possible.

46. In creating their damages model, we started with the calculated range of maximum, best-case damages, and then calculated a range of potential outcomes dependent upon potential variances in scope (in terms of locations, headcounts, and participation), individual damages (variances in the number of hours shaved each workday and workweek), and success on the merits.

47. In approximately mid-October 2022, the parties began arm's-length negotiations, starting with first conferring, sharing, and explaining our divergent views on the merits of the case, the hurdles to collective and class certification, and damages, before I further provided a detailed explanation of their damages calculations and the variables utilized therein.

48. The parties' negotiations, discussions, and further exchanges of information continued until they reached an agreement in principle on what became the gross settlement amount on or about December 27, 2022, or approximately three (3) months after their negotiations began.

49. Thereafter, the parties continued our negotiations with respect to all other aspects of their settlement, including the non-monetary terms of the agreement, such as the releases of claims to be contained therein, confidentiality, administration, and taxation, and additional

monetary terms, such as determining individual allocations, Plaintiff's Service Award, and our attorneys' fees and costs. These negotiations continued into late-March 2023, or another approximately three (3) months.

50. As part of the settlement administration of this case, Rust Consulting, Inc. was responsible for sending and has sent CAFA Notices. As of today, December 6, 2024, no objections or responses have been received in response to those Notices.

51. During the notice period applicable to the parties' settlement, notice recipients were instructed to contact our firm with any questions and concerns regarding the same. While we did receive inquiries during the notice period (as reflected in our billing records), none of the individuals who contacted us expressed any concerns or reservations regarding the Settlement Agreement, Plaintiff's Service Award, or our requested attorneys' fees and costs.

52. Attached hereto as Exhibit 2 is a true and accurate copy of the Notice of Class and Collective Action and Proposed Settlement that was sent to all WWPCL Class members.

53. Attached hereto as Exhibit 3 is a true and accurate copy of the Notice of Class and Collective Action and Proposed Settlement that was sent to all putative FLSA Collective members who worked for Defendant outside of the State of Wisconsin and, therefore, were ineligible to participate in the WWPCL Class.

54. Attached hereto as Exhibit 4 is an updated version of Exhibit A to the parties' Settlement Agreement, identifying the amounts payable to all Settlement Class members. As reflected therein, of the $405,089.20 allocated to the FLSA Collective, $86,089.60 was "claimed" by the 704 individuals who consented to join the same, and of the $208,244.13 allocated to the WWPCL Class, $207,068.91 was claimed by the 2,560 participating WWPCL Class members who did not request exclusion from the same.

55.     By bringing her concerns to us and deciding to pursue litigation against Defendant at such time that she was still employed at Defendant, Plaintiff truly "stuck her neck out" for the hourly employees on whose behalf she decided to bring her claims.

56.     On May 11, 2022, approximately two (2) weeks after Plaintiff's Complaint was filed, and five (5) days after Defendant waived service, Defendant terminated Plaintiff's employment.

57.     Pursuant to our fee agreement with Plaintiff, Plaintiff was made aware of and understood that if she did not prevail on her claims, she "can become liable to pay the opposing party's taxable costs and disbursements as provided by law," and was "ultimately responsible for paying such costs, if awarded."

58.     Plaintiff's involvement was critical to our assessment of what may constitute a reasonable resolution of this litigation. For this reason, while we were performing damages calculations and creating our damages model, we needed and Plaintiff provided, her input into what amount of the calculated delta between employees' compensated and "raw" hours could reasonably be considered compensable work time, as well as the amount of time that could reasonably be included to represent employees' time spent donning and doffing each workday. We also discussed each (proposed) offer and counteroffer with her, and she provided us with feedback and authorizations.

59.     During actual negotiations, Plaintiff was involved in the same, discussing each (proposed) offer and counteroffer with her counsel, providing her feedback concerning the same, and ultimately authorizing the offers of settlement Plaintiff's counsel conveyed.

60.     During the pendency of this litigation (and beforehand), we were incredibly reliant on Plaintiff and her knowledge of Defendant, its employees, and its employment policies and

practices. For much of the litigation, she was not only the only named plaintiff, but also the only individual who consented to join the same. Accordingly, not only was she tasked with representing the absent class (and putative collective), but she also achieved a successful resolution to her claims without the help, assistance, or support of any other plaintiffs or any other current or former employees of Defendant.

61.     Attached hereto as Exhibit 5 are true and correct screenshots of search results for the term "Karrie Ackley" in Microsoft Bing and Google Chrome as were returned on December 2, 2024.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 6th day of December, 2024.

 s/ *James A. Walcheske*
James A. Walcheske